## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 13-12843-MSH |
| JEFFREY S. REALE | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| USALLIANCE FEDERAL CREDIT | ) | |
| UNION | ) | |
| | ) | Adversary Proceeding |
| Plaintiff | ) | No. 14-1185 |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY S. REALE | ) | |
| | ) | |
| Defendant | ) | |

### MEMORANDUM OF DECISION

USAlliance Federal Credit Union initiated this adversary proceeding by filing a complaint against Jeffrey S. Reale, the debtor in the main chapter 7 case, seeking a judgment under Bankruptcy Code § 523(a)(2)(A) and (B) and § 523(a)(6) excepting from Mr. Reale's discharge his indebtedness to the credit union.[1]  After conducting a trial in which the parties introduced evidence by way of testimony and documents, including the pre-recorded deposition testimony of an unavailable witness, Charles Vickery, and after carefully considering that evidence, as well the parties' written submissions, I hereby render my findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052.

---

[1] All references to the Bankruptcy Code or Code are to 11 U.S.C. § 101 *et seq.*

Beginning in 2003 or 2004, Mr. Reale, while employed in the technology industry, decided to try his hand at real estate ownership and development. In 2004 he joined Empire Sheetrock and Plastering, Inc., a company owned by his sister and brother-in-law, Jeanine and James Reardon. He became an employee of Empire, which in 2005 changed its name to Empire Companies, Inc. Also in 2005 he became an owner along with Ms. Reardon of Empire Real Estate, LLC. Mr. Reale and Ms. Reardon served as managers of Empire Real Estate, LLC.

On June 7, 2005, Mr. Reale as settlor formed the Reale Family Trust and named himself as trustee. Mr. Reale testified at trial that he was also a beneficiary of the trust. On that date the trust purchased the real estate at 197 Union Street in Rockland, Massachusetts for $419,000 in cash. No financing was involved in the purchase.

In late 2005 or early 2006, Mr. Reale learned about an undeveloped 40-acre subdivision in Rockland called Beachwood Village. The subdivision was approved for the construction of 79 units of housing. Mr. Reale arranged to purchase the subdivision intending to develop it as a so-called 55 and older community. On May 11, 2006, Mr. Reale as settlor formed the Beachwood Village Realty Trust naming himself as sole trustee. He and Mr. Reardon each received a 50% beneficial interest in the trust.

The Beachwood Village Realty Trust took title to the Beachwood Village subdivision at a closing on May 11, 2006. The purchase price was $4 million. The seller took back a purchase money note for $1.9 million. The balance of the purchase money plus closing costs consisted of $361,000 in cash and a $2.1 million loan from the credit union.

Mr. Reale had been introduced to the credit union by his mortgage broker, Kristin Cowling of Consolidated Mortgage Services, in connection with a previous loan for the purchase

of property at 28 Webster Street in Rockland. Charles Vickery, the credit union's manager of

mortgage lending, worked with Mr. Reale and Ms. Cowling on the Webster Street loan and

subsequently on the Beachwood Village loan.

The loan from the credit union for the Beachwood Village project was structured as two

loans: a $2.1 million acquisition loan and $2.8 million construction loan. Both loans closed on

May 11, 2006, as part of the acquisition transaction. Mr. Reale, individually, was the borrower

on both loans with the Beachwood Village Realty Trust guaranteeing the loans and securing its

guarantee with a first mortgage on the Beachwood Village real estate. The Beachwood Village

sellers secured their purchase money note with a second mortgage on the property. Sean Fallon

was the attorney for Mr. Reale, Beachwood Village Realty Trust and the credit union in the

transaction and acted as settlement agent at the closing.

Almost all of the $361,000 cash payment made by the Beachwood Village Realty Trust at

the closing came from a loan which Mr. Reale had arranged through Mr. Fallon. On May 3,

2006, Mr. Fallon's client, F&F Realty Trust, a trust controlled by Mr. Fallon and in which he had

a beneficial interest,[2] had loaned the $350,000 to Mr. Reale, taking back a promissory note

signed by Mr. Reale, individually and as trustee of the Reale Family Trust, and Mr. Reardon. Mr.

Fallon represented all parties to the loan and acted as settlement agent. The F&F note was

secured by a first mortgage on the previously unencumbered property at 197 Union Street in

Rockland referred to above. Mr. Reale deposited the net proceeds of the F&F loan, $344,000,

into his account at South Shore Bank.

In his trial testimony Mr. Reale repeatedly denied that the F&F loan was intended to

---

[2] *See* Joint Pretrial Memorandum, section II at ¶ 6 (docket #20).

3

provide the cash component of the Beachwood Village purchase price or was used for that

purpose. Mr. Reale insisted that the money was used to establish an interest reserve from which

he would make monthly interest payments on the credit union's loans. Mr. Reale's testimony on

this point was false. The documentary evidence introduced at trial establishes, and I find, that

Mr. Reale asked Mr. Fallon to arrange a loan in order to raise the cash he needed for the

Beachwood Village purchase, that the F&F loan was that loan, that $344,000 in loan proceeds

were deposited into Mr. Reale's South Shore Bank account on or about May 3, 2006, and that a

check dated May 11, 2006, was drawn on that account in the amount of $344,163.84 to fund the

bulk of the cash portion of the Beachwood Village purchase price at the May 11, 2006 closing.

Before agreeing to close the loans to Mr. Reale in 2006, the credit union required Mr.

Reale to satisfy a number of preconditions which were set forth in a letter dated February 21,

2006, from Mr. Vickery to Mr. Reale's mortgage broker, Ms. Cowling. The letter pre-approved

the loan subject to satisfaction of the preconditions, including Mr. Reale's supplying the credit

union with three years of tax returns, copies of recent bank, mutual fund, retirement and

brokerage account statements, and recent mortgage statements for all properties in which Mr.

Reale had an interest. Other pre-conditions included the credit union's obtaining a satisfactory

credit report on Mr. Reale and satisfactory appraisal and environmental reports on the

Beachwood Village property.

Prior to the issuance of the pre-approval letter, the credit union required Mr. Reale to

complete one or more form loan applications for the Beachwood Village loans. Mr. Reale

testified, and I find, that the initial loan application or applications were prepared by him with the

assistance of Ms. Cowling prior to February 21, 2006, the date of the pre-approval letter.

4

At the trial, two loan applications signed by Mr. Reale were introduced into evidence. Both were dated May 11, 2006, the closing date of the Beachwood Village transaction. One referred to the acquisition loan and the other to the construction loan. Apart from the reference to the different loans, the applications are identical. The applications consist of pre-printed forms with information inserted relative to Mr. Reale's income, expenses, assets and liabilities. On page 3 of each application, above Mr. Reale's signature the following statement is printed:

> Each of the undersigned specifically represents to Lender . . . and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance on any misrepresentation that I have made on this application, and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq. . . . (7) the Lender, its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to the closing the loan. . . .

On page 4 of the applications above a second signature by Mr. Reale, the following statement is printed:

> I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

While I have credited Mr. Reale's testimony that he initially submitted his loan application or applications prior to February 21, 2006, he also admitted that the signatures on the two May 11, 2006 loan applications are his. Mr. Vickery testified, and I find, that it was the credit union's regular practice to bring completed loan applications dated as of the loan closing date to all closings so that borrowers could review and sign them as of the closing date and that

this was the case in connection with the Beachwood Village loans. Thus, I find that while Mr.

Reale submitted an initial loan application or applications to the credit union in connection with

the Beachwood Village financing prior to February 21, 2006, the applications were updated as of

the May 11, 2006 closing and signed by Mr. Reale at the closing. This finding is supported by

the fact that the May 11, 2006 loan applications both reflect that Mr. Reale's South Shore Bank

Account had a balance of $348,677. The evidence has established that $344,000 of this sum was

derived from the F&F loan on May 3, 2006, so the loan applications were updated by Mr. Reale

sometime after May 3, 2006.

The May 11, 2006 loan applications prepared by Mr. Reale and signed by him contain

serious errors and omissions. As just indicated, they represent that Mr. Reale held $348,677 in

his South Shore Bank account. What they fail to disclose is an offsetting liability to F&F Realty

Trust for the $350,000 loan that was the source of the funds. The loan applications do not include

among Mr. Reale's assets his beneficial ownership interest in the Reale Family Trust, his status

as trustee of the trust, or any reference to the property at 197 Union Street owned by the trust and

the fact that the F&F loan was secured by a mortgage on that property. Mr. Reale's excuse at

trial for not making reference to the Reale Family Trust in the loan applications was that he

limited his answers to assets and liabilities in his name individually and not to those held in trust.

The feebleness of this excuse, however, is reflected on the applications' schedules of real estate

owned, where Mr. Reale lists 28 Webster Street in Rockland, a property also owned by a trust.

Additional deficiencies in the loan applications include the omissions of Empire

Sheetrock or its successor, Empire Companies, as Mr. Reale's employer, and Mr. Reale's

ownership interest in Empire Real Esate, LLC. The most troubling deficiency of all in the loan

6

applications was Mr. Reale's answer to the question, "is any part of the down payment

borrowed?" He checked the box marked "no" even though he had borrowed almost the entirety

of the down payment from F&F.

Mr. Vickery and also James White, executive vice president of the credit union, credibly

testified at trial, and I find, that as of the May 11, 2006 closing, the credit union was unaware of

Mr. Reale's loan from F&F or that the loan funded the bulk of the cash down payment for the

Beachwood Village acquisition. They also testified, and I find, that the credit union was unaware

of Mr. Reale's interest in the trust that owned the 197 Union Street property. Finally, they

testified, and I find, that had the credit union been made aware of these facts, and in particular

that Mr. Reale had borrowed the down payment, it would not have closed the loans to Mr. Reale

in 2006.

On April 11, 2007, Mr. Reale refinanced his 2006 Beachwood Village acquisition and

construction loans with a new $4.7 million loan from the credit union. The old loans, which then

had a combined balance of $4,218,791.22, were paid off, $370,200 of the new loan was set aside

for an interest reserve and "construction holdbacks," and Mr. Reale received $76,746.87 in cash

proceeds at the closing.

As part of the 2007 refinancing Mr. Reale executed a loan application dated April 11,

2007. This loan application was introduced into evidence at trial. Apart from its date, the loan

amount and the interest rate, the 2007 loan application is identical to the loan applications signed

by Mr. Reale on May 11, 2006. Despite the passage of 11 months, the 2007 loan application

presents Mr. Reale's financial condition as unchanged from his financial condition on May 11,

2006. And, of course, all the errors and omissions contained in the 2006 applications are carried

7

forward in the 2007 version.

The record, not to mention common sense, establishes that Mr. Reale's financial

condition could not possibly have remained static between May 2006 and April 2007. First of all,

contrary to the representation in the 2007 loan application, he no longer had $348,677 in cash in

his South Shore Bank account, having used the money for the down payment on the Beachwood

Village property. Second, since each and every liability and loan balance listed in his 2006 loan

applications remained unchanged in his 2007 loan application, either Mr. Reale was in default on

all his installment debt for failure to make payments to any of his lenders (something he should

have disclosed) or the balances in the 2007 application were all wrong. Additionally, the

evidence at trial established, and I find, that during the 11 months between the first and second

loan applications, Mr. Real had incurred significant new debt that he failed to disclose on his

2007 loan application.

On January 3, 2007, Mr. Reale, individually and as trustee of the Beachwood Village

Realty Trust, and Mr. Reardon borrowed $350,000 from the C&D Realty Trust, another client of

Sean Fallon. The debt to C&D was secured by a mortgage on lot 7 of the Beachwood Village

property. Mr. Reale used a portion of the C&D loan to make lot release payments to the credit

union and to the Beachwood Village seller in order to obtain partial releases of their respective

mortgages so that the C&D mortgage would enjoy first position on the lot. Mr. Fallon

represented Mr. Reale, Mr. Reardon, the Beachwood Village Trust, C&D and the credit union in

this transaction. When the credit union refinancing closed on April 11, 2007, with Mr. Fallon

again representing all parties, Mr. Fallon caused the C&D first mortgage on lot 7 to be

subordinated to the credit union's new mortgage.[3]

Also, during the 11 months between the two sets of loan applications, Mr. Reale personally guaranteed a substantial line of credit opened with National Lumber Company to purchase materials for the construction of homes at Beachwood Village.

None of this was disclosed in Mr. Reale's 2007 loan application. According to the credible testimony of Messrs. Vickery and White, it was not communicated in any way whatsoever by Mr. Reale to the credit union. Thus, as was the case with the 2006 loan applications, I find that Mr. Reale's 2007 loan application was false. Also, I find based on the evidence at trial that on April 11, 2007, when the credit union refinancing closed, the credit union was unaware of the C&D transaction or the National Lumber line of credit and would not have completed the refinancing had it known about them.

Idries Shah, an author and Sufi philosopher has astutely observed, "right time, right place, right people equals success."[4] It is entirely possible, had our national economy not

---

[3] Sean Fallon played a central role in the events surrounding the Beachwood Village transaction. He represented almost every party involved —not only Mr. Reale and the Beachwood Village Realty Trust, but also the credit union, F&F Realty Trust, C&D Realty Trust and James Reardon. Like a puppet master pulling strings, he controlled the movement of information, documentation and money among his various clients without regard to the particularized and potential adverse interests of each. While the record in this proceeding established that Mr. Fallon informed Mr. Reale of the potential conflict of interest that could result from his multi-party representation and obtained Mr. Reale's waiver of the conflict, Mr. Fallon failed to do the same with respect to the credit union. The credible testimony of both Mr. Vickery, the credit union's manager of mortgage lending, and James White, the credit union's executive vice president, was that Mr. Fallon never requested a conflict waiver from the credit union and never informed the credit union about his involvement in side loans to Mr. Reale. Despite all of this, or perhaps because of it, neither party thought it worthwhile to subpoena Mr. Fallon to testify at the trial in this proceeding.

[4] IDRIES SHAH, REFLECTIONS 81 (ISF Publishing, 2014). His *bon mot* concludes: "Wrong time,

9

imploded in 2008, that Mr. Reale's foray into real estate development would have been a triumph, the credit union would have been paid back all its money and Beachwood Village would today be teeming with contented seniors. Had it been so, the misrepresentations made by Mr. Reale to the credit union would have mattered not at all. Regrettably, events unfolded as they unfolded and Mr. Reale's real estate interlude ended in failure. Despite a series of workout agreements between Mr. Reale and the credit union between 2008 and 2012, the project could not be saved. The credit union called the loan after April of 2012, Mr. Reale filed bankruptcy in 2013, and who misrepresented what to whom has become a point of great importance.

The credit union relies on three independent grounds for demanding that its monetary claim against Mr. Reale be excluded from his general discharge in bankruptcy. These grounds correspond to three subsections of § 523 of the Code which lists debts that are non-dischargeable in bankruptcy. The relevant subsections are: (a)(2)(A) – debts incurred by false representations or fraud other than with respect to statements regarding the debtor's financial condition;[5] (a)(2)(B) – debts incurred based on false representations in a written financial statement;[6] and

---

wrong place, wrong people equals most of the real human history."

[5] The relevant statutory language excepts from discharge debts:

"for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition. . . ."

[6] The statute provides in relevant part for the non-discharge of debts:

"for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;

(a)(6) – debts for willful and malicious injury.[7]

In any non-dischargeability case the party seeking to exclude its debt from discharge bears the burden of proof that its claim falls under one of the subsections of § 523. *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997). Taking the credit union's last claim first, I conclude that it has not carried its burden to prove that the debt owed to it arose from an injury brought about by Mr. Reale's willful and malicious conduct. In order for an injury to be willful, the debtor must have intended to cause the injury or have been substantially certain that an injury would result. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). It is not enough that a debtor intend the act which leads to the injury, even if the debtor was negligent or reckless in performing the act. *Id*. at 63. To establish that the injury was malicious, the injury must be "wrongful," "without just cause or excuse," and "committed . . . in conscious disregard of one's duties." *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir. 1997).

The evidence in this proceeding establishes that Mr. Reale had every intention of developing a successful 55 and older residential community at Beachwood Village when he entered into and later refinanced his loans with the credit union. It may be that in hindsight, based on his lack of experience or expertise, he wasn't the best choice to oversee development, but incompetence or inexperience does not equal maliciousness. Certainly, no evidence was

---

(iii) on which the creditor to whom the debtor is liable for such ... credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . ."

[7] The subsection excludes from discharge, debts:

"for willful and malicious injury by the debtor to another entity or to the property of another entity. . . . "

presented to suggest that Mr. Reale used the credit union's money for any improper purpose. Simply put, the credit union has no case under § 523(a)(6).

The remaining credit union claims arise under Code § 523(a)(2) involving borrowing money or refinancing debt by means of false representations. Subsection (a)(2) contains two circumstances for statutory applicability that are opposite sides of the same coin – (A) borrowing on false representations "other than a statement respecting the debtor's or an insider's financial condition," and (B) borrowing based on a false representation in writing "respecting the debtor's or an insider's financial condition."

With respect to § 523(a)(2)(A), the credit union claims that Mr. Reale made misrepresentations, apart from those in connection with his written loan applications, relating to the January 12, 2007 loan from C&D Realty Trust to Mr. Reale and the Beachwood Village Realty Trust in which the trust gave C&D a mortgage on lot 7 at Beachwood Village. I have found that Mr. Reale concealed this transaction from the credit union which did not know about it when it refinanced its loans with Mr. Reale on April 11, 2007. Under section 1.13 of the credit union's mortgage, the placing of the C&D mortgage on the Beachwood Village property was an event of default. I have also found that had the credit union been made aware of the C&D transaction, it would have been justified in not completing the 2007 refinancing due to the default.

Under venerable First Circuit precedent, in order to establish that a debt is non-dischargeable under § 523(a)(2)(A) as having been obtained by false pretenses, false representations or actual fraud,

> a creditor must show that: 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the

12

debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*McCory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (internal citation and footnote omitted).

The facts surrounding the C&D loan satisfy all the criteria for a finding of non-dischargeability under § 523(a)(2)(A).[8] Mr. Reale misrepresented by concealing from the credit union his conduct. A debtor's silence regarding a material fact constitutes a false pretense or false representation under § 523(a)(2)(A). *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013) ("A false pretense or misrepresentation can be created when the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, and where the silent party may have a duty to correct what would otherwise be a false impression.") (internal citations and quotation marks omitted). Mr. Reale's concealment was intended to induce the credit union not to default his loans and by logical extension to refinance the loans in 2007. By negative inference, the credit union relied on Mr. Reale's

---

[8] Section 523(a)(2)(A) and (B) are mutually exclusive in the sense that false statements about a debtor's financial condition may only be asserted as non-dischargeable under § 523(a)(2)(B) while false statements *other than* about the debtor's financial condition my only be asserted as non-dischargeable under § 523(a)(2)(A). *See Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 707 (10th Cir. 2005). This proceeding involves the somewhat unusual situation where the same transaction includes elements of both § 523(a)(2)(A) and (B). The C&D transaction involved a concealed loan (an act relating to Mr. Reale's financial condition) and the undisclosed mortgaging of lot 7 (a misrepresentation not involving his financial condition). I do not view the dual application of the C&D transaction as invading territory currently occupied by the Supreme Court in *Lamar, Archer & Cofrin, LLP v. Appling*, No. 16-1215, 2018 WL 386562 (U.S. Jan. 12, 2018), in which the Court has granted *certiorari* to resolve a circuit split over the meaning of the phrase "statement respecting the debtor's financial condition" as used in § 523(a)(2). Mr. Reale's failure to disclose to the credit union his placing of a junior mortgage on the Beachwood Village property in violation of his loan agreement does not constitute a misrepresentation concerning his financial condition under any interpretation of § 523(a)(2), whether narrow or broad.

misrepresentation because had it known of the C&D transaction it would justifiably have placed

Mr. Reale's loans in default and would certainly not have proceeded with the refinancing.

The credit union attempted to argue that Mr. Reale's concealment of his line of credit

transaction with National Lumber as well as the existence of a lawsuit brought by Kamco Supply

Corp. against, among other defendants, Mr. Reale as trustee of a trust unrelated to Beachwood

Village, were additional examples of misrepresentations that justified a finding of non-

dischargeability under § 523(a)(2)(A). Mr. Reale testified that the National Lumber line of credit

had not been drawn against when the 2007 refinance transaction occurred and that he personally

was not a party to the Kamco litigation, and so he assumed neither of these matters required

disclosure prior to the 2007 refinance transaction. Furthermore, unlike the secret mortgaging of

lot 7 to C&D, these matters relate to Mr. Reale's financial condition and thus are not grounds for

a § 523(a)(2)(A) claim. *See Joelson*, 427 F.3d. at 707. Accordingly, I conclude that the National

Lumber and Kamco matters do not support a non-dischargeability ruling under § 523(a)(2)(A).

The credit union's remaining claim against Mr. Reale is the one under § 523(a)(2)(B),

that Mr. Reale's loan applications were false financial statements upon which the credit union

relied in making the 2006 loans and refinancing them in 2007. There has been no disagreement

that Mr. Reale's loan applications are financial statements within the meaning of the statute.

They set forth in detail his assets, liabilities, income and expenses which is precisely what a

financial statement is supposed to do. I find, therefore, that Mr. Reale's 2006 and 2007 loan

applications are written statements regarding his financial condition under § 523(a)(2)(B). I have

previously found that they were false in a number of respects. The statute, however, requires not

only untruthfulness but also materiality of the falsehoods.

What rises to the level of a materially false financial statement has previously been summarized by this court.

> An incorrect or erroneous financial statement is not necessarily materially false. *L. King, Collier on Bankruptcy,* Par. 523–09, at 523–52 (15th ed. Supp.1982). A materially false statement is one which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *In Re Hunt,* 30 B.R. 425, 440 (Bankr. M.D. Tenn.1983). The question of materiality should be judged not on the basis of the size or seriousness or the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it. *In Re Valley,* 21 B.R. 674 (Bankr. D. Mass. 1982). A financial statement which markedly over-states the value of a person's assets, so as to distort his financial picture must be considered materially false. *In Re Hunt,* 30 B.R. 425 (Bankr. M.D. Tenn. 1983); *In Re Tomeo,* 1 B.R. 673 (Bankr. E.D. Pa. 1979).

*In re Denenberg*, 37 B.R. 267, 271 (Bankr. D. Mass. 1983).

That the numerous errors and omissions contained in the 2006 and 2007 loan applications were material is not a close question. The following in particular establish materiality: Mr. Reale's claiming to have $348,677 in free cash in his South Shore Bank account, his falsely stating that he had not borrowed the down payment for the Beachwood Village acquisition, his failure to disclose his ownership interests in Empire Real Estate LLC and the Reale Family Trust, his failure to disclose his indebtedness to F&F and C&D, and his failure to disclose his guaranteeing of the National Lumber line of credit.

I also find that these and other errors and omissions in the 2006 and 2007 loan applications were made by Mr. Reale with the intent to deceive the credit union. The intent to deceive refers to the debtor's state of mind and can be proven in one of several ways:

> If the maker of the misrepresentation "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies. Restatement (Second) of Torts § 526."

15

*Palmacci*, 121 F.3d at 787. "[I]ntent to deceive under section 523(a)(2)(B) may be demonstrated by the debtor's knowledge of, *reckless* indifference to, or *reckless* disregard for the written statement's falsity." *Toye v. O'Donnel (In re O'Donnell)*, 728 F.3d 41, 47 (1st Cir. 2013) (emphasis in the original). "Intent to deceive is present when the debtor has seen the financial statement and the errors were such that he knew or should have known of their falsity." *In re Coughlin*, 27 B.R. 632, 636 (B.A.P. 1st Cir. 1983) (internal citations and quotation marks omitted). "A debtor's mere unsupported assertions of honest intent will not overcome natural inferences derived from admitted facts." *In re Movshovich*, 521 B.R. 42, 63 (Bankr. D. Mass. 2014).

In his trial testimony, Mr. Reale tried to explain away the errors in the 2006 loan applications by insisting that he had completed them in early 2006, prior to borrowing any money from F&F Realty Trust, and hinting that the loan applications he signed at the closing on March 11, 2006, had been altered by parties unknown to include false information. He also testified that the loan from F&F was not to fund the Beachwood Village down payment but to create an interest reserve. Based on my findings above, Mr. Reale's testimony in regard to these points was false and rather than exonerating him from the claim that he falsified financial information, his testimony reinforces my conclusion that he prepared the 2006 loan applications with the intent to deceive.

Finally, the statute requires that the credit union reasonably relied on the financial statements, a conclusion "drawn from the circumstances surrounding the transaction." *In re Kosinski*, 424 B.R. 599 (B.A.P. 1st Cir. 2010). As the *Kosinski* court stated:

The indicia of reasonableness include:

16

(1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* at 611.

The trial testimony of the two credit union executives established that the credit union would not have made the loans to Mr. Reale in 2006 to acquire and develop the Beachwood Village property had it known the down payment was borrowed. In other words, the credit union relied on Mr. Reale's false answer to the question, "is any part of the down payment borrowed?" I find that the credit union's reliance on Mr. Reale's representations with respect to the 2006 loan applications was reasonable. It is standard industry practice and, as testified to by the credit union executives, the policy of the credit union, to refrain from making purchase money loans to borrowers who borrow down payments.

The critical difference between the 2006 and 2007 transactions, however, is that while the credit union reasonably relied on the 2006 loan applications in closing the loans to Mr. Reale, it either didn't rely on the 2007 application in closing the refinance transaction or if it did, such reliance was unreasonable. To the extent the testimony of the credit union's officers supports the claim that the credit union relied on the 2007 loan application in closing the 2007 loan, I find such testimony lacking in credibility. In any event, assuming the credit union had relied on the 2007 loan application, such reliance would have been unreasonable. Even the most cursory comparison of the 2007 application with the earlier ones would have revealed that the latter application was an exact copy of the prior ones and, if for no other reason than the passage of

time, the 2007 application could not possibly have been reliable.

The question thus arises, can the credit union's debt (namely the amount owed by Mr.

Reale under the 2007 refinance transaction) be held non-dischargeable based on the false loan

applications submitted by him in 2006 to obtain loans that are technically no longer outstanding?

The answer is yes as to that portion of the 2007 refinance that relates back to the 2006 loans.

"When a loan is made on the basis of a false financial statement and the loan is subsequently

renewed or consolidated under nonfraudulent conditions, the original amount extended on the

basis of a false statement remains nondischargeable." *Sovran Bank, N.A. v. Allen (In re Allen)*,

65 B.R. 752, 764 (E.D. Va. 1986) (internal footnote omitted) (citing *In re Liming,* 22 B.R. 740,

742 (Bankr. W.D. Okla. 1982).

In a case decided under the Code's predecessor, the Bankruptcy Act of 1898, the United

States Court of Appeals for the Seventh Circuit ruled:

> One further point deserves mention. On appeal, the district court affirmed, inter alia, the bankruptcy judge's determination that because the November 1, 1973 renewal note extinguished all prior notes signed by Garman, the only circumstances to be evaluated under s[ection] 17(a)(2) were the circumstances surrounding the last renewal. To adopt such a position, however, is to hold that because the Northern failed to discover Garman's misrepresentation at the time of the renewal, all prior alleged misrepresentations by Garman were excused. This we refuse to do.

*Northern Trust Co. v. Garman (In the Matter of Garman)*, 643 F.2d 1252, 1260 (7th Cir. 1980).[9]

Thus, to the extent the credit union loaned Mr. Reale fresh cash in 2007, the false 2006

loan applications do not impede discharge of the debt represented by the fresh cash. As indicated

previously, the 2007 refinance paid off the 2006 loans in the total amount of $4,218,791.22, set

---

[9] The legislative history of § 523(a)(2)(B) makes it clear that Congress intended to codify prior case law interpreting the section's predecessor, Bankruptcy Act § 17(a)(2). *Allen*, 65 B.R. at 758.

up an interest and holdback reserve of $370,200 that would have all gone back to the credit union

in interest payments or setoffs, and advanced Mr. Reale $76,746.87 in fresh cash. Under the

foregoing principles, the credit union's debt up to $4,218,791.22 is non-dischargeable under

Code § 523(a)(2)(B) as having been based on the false 2006 loan applications. Of course because

the credit union has established a separate basis for non-dischargeability under § 523(a)(2)(A) as

a result of Mr. Reale's concealing the junior mortgage on lot 7 in 2007, as a practical matter even

the fresh cash portion of the refinancing is non-dischargeable.

One final point in Mr. Reale's defense merits discussion. It is axiomatic under principles

of agency law that an attorney's knowledge is binding on his client. *Flynn v. Wallace*, 359 Mass.

711, 718 (1971). Here, substantially all Mr. Reale's misrepresentations to the credit union in

connection with both the 2006 and 2007 loan transactions were known to Sean Fallon, the credit

union's attorney. While under ordinary circumstances, Mr. Fallon's knowledge would be

imputed to the credit union, thereby completely undercutting the credit union's claims under §

523(a)(2)(A) and (B), the facts here are anything but ordinary. Mr. Fallon actively participated in

the F&F and C&D loans to Mr. Reale, assisting Mr. Reale in locating the F&F loan for the

Beachwood Village down payment and representing the lenders as well as Mr. Reale in both

transactions. The evidence at trial established that had the credit union been aware of these loans

it would not have closed the 2006 and 2007 loans. By failing to inform his client, the credit

union, about the F&F and C&D transactions, Mr. Fallon breached his duty to the credit union.

"A long-standing principle in our jurisprudence holds that we will not impute to the principal

notice to an agent regarding a fraudulent act in which the agent is engaged against the principal."

*Lawrence Sav. Bank v. Levenson*, 59 Mass. App. Ct. 699, 705 (2003) (citing *Allen v. South*

19

*Boston R.R. Co.*, 150 Mass. 200, 206 (1889). In the somewhat unique circumstances of this proceeding, therefore, I conclude that Mr. Fallon's knowledge regarding various aspects of Mr. Reale's business dealings cannot be imputed to the credit union.

Based on the foregoing, the credit union has carried its burden to prove that under Bankruptcy Code § 523(a)(2)(A) and (B) Mr. Reale's debt to it should not be discharged. Therefore, judgment shall enter in favor of the credit union on counts 1 and 2 of its complaint.

Dated: February 1, 2018                                          By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

cc:      David Rosen, Esq.
         Rosen Legal, LLC
         Waltham, MA
              for the plaintiff, US Alliance Federal Credit Union


         Gary W. Cruickshank, Esq.
         Boston, MA
              for the defendant, Jeffrey S. Reale